FILED FOR RECORD
Ashley County, Arkansas

IN THE CIRCUIT COURT OF ASHLEY COUNTY, ARKANSAS
_____ DIVISION

at 3:30 o'clock ____ m

APR 25 2013

MARK MORRIS AND MORRIS TRANSPORTATION, INC.          PLAINTIFF

VICKIE STELL CIRCUIT CLERK

v.                        CASE NO. CV13-52-4          By _____ _____ DC

INTEGRATED FREIGHT CORPORATION, INC.                 DEFENDANT

## COMPLAINT

Mark Morris ("Morris") and Morris Transportation, Inc. ("MTI"), submits the following as its complaint against defendant Integrated Freight Corporation, Inc. ("IFC"):

## I.    PARTIES

1.    Morris is a resident of Ashley County, Arkansas.

2.    MTI is a domestic business corporation organized under the laws of the State of Arkansas and has been authorized to do business in the State of Arkansas since June 26, 1998. Its principal offices are located at 728 Highway 52 West, Hamburg, Arkansas 71646.

3.    Upon information and belief, defendant IFC is a business corporation organized under the laws of the State of Florida. Its principal offices are located at 8374 Market Street #478, Bradenton, FL 34202. IFC is not registered with the Arkansas Secretary of State's office as a foreign corporation.

## II.    JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject matter of this litigation pursuant to Ark. Code Ann. § 16-13-201.

5.    This Court has personal jurisdiction over the parties to this action.

1

1166916-v1

6.    Venue is proper in this Court pursuant to Ark. Code Ann. § 16-55-213 because Ashley County, Arkansas, is the county where Morris and MTI reside and resided at the time of the actions giving rise to this suit.

### III.    STATEMENT OF FACTS

7.    On August 25, 2008, Morris, then the sole shareholder of MTI, entered into a Stock Exchange Agreement with IFC (the "Stock Exchange Agreement"), whereby Morris exchanged all of the shares of MTI in return for shares of IFC common stock, and MTI became a wholly-owned subsidiary of IFC.  A copy of the Stock Exchange Agreement is attached hereto as Exhibit 1 and incorporated herein.

8.    Pursuant to the Stock Exchange Agreement, IFC was required to issue a promissory note in the amount of $250,000 to Morris (the "Promissory Note"). (Exhibit 1, § 2.02).  The Promissory Note was to mature one year following closing of the stock exchange, and was to be convertible at Morris's election into additional shares of IFC common stock.

9.    Pursuant to the Stock Exchange Agreement, IFC was required to make a payment of $750,000 to Morris within ninety (90) days after the closing of the stock exchange. (Exhibit 1, § 2.02).

10.    Pursuant to the Stock Exchange Agreement, IFC was required to refinance MTI's equipment to the satisfaction of MTI. (Exhibit 1, § 5.08(a)).  The purpose of the refinancing was to eliminate personal guaranties by Morris in connection with the equipment and to improve MTI's working capital. (Exhibit 1, §5.08(a)).

2

11.     Pursuant to the Stock Exchange Agreement, MTI was to be operated as a separate corporation distinct from IFC. (Exhibit 1, § 5.08(b)).

12.     Pursuant to the Stock Exchange Agreement, in the event that IFC failed to make the $750,000 payment, failed to refinance MTI's equipment within ninety (90) days of the closing of the stock exchange (extendable by a period of up to sixty (60) additional days under certain conditions), or failed to establish a public trading market for its common stock within one hundred eighty (180) days following the closing of the stock exchange, then Morris was entitled to return the IFC common stock he received in connection with the transaction in exchange for MTI's stock. (Exhibit 1, § 5.08(c)).

13.     On or about September 17, 2008, IFC and Morris entered into an Amendment of Stock Exchange Agreement ("First Amendment"). A copy of the First Amendment is attached hereto as Exhibit 2 and incorporated herein. Pursuant to the First Amendment, the Promissory Note was to be secured by a first priority security interest in favor of Morris in the MTI stock acquired by IFC. (Exhibit 2, at 1).

14.     Pursuant to the First Amendment, IFC granted Morris a proxy to vote MTI's stock until the Promissory Note was paid in full. (Exhibit 2, at 1).

15.     Pursuant to the First Amendment, IFC's obligation to refinance all of MTI's equipment was extended until no later than sixty (60) days following the effective date of IFC's first registration statement filed with the U.S. Securities and

3

Exchange Commission. (Exhibit 2, at 1-2). IFC's first such registration statement was effective on July 27, 2009.

16.     Pursuant to the First Amendment, IFC was required to provide $100,000 of working capital to MTI. (Exhibit 2, at 2). If IFC failed to refinance MTI's equipment within the allotted time, IFC was required to provide an additional $100,000 of working capital to MTI and make a $50,000 cash payment to Morris. (Exhibit 2, at 2).

17.     Pursuant to the First Amendment, IFC agreed to make an additional $250,000 payment to Morris within thirteen months of the date of the First Amendment, which such amount could be reduced in certain circumstances. (Exhibit 2, at 2).

18.     On January 19, 2010, PlanGraphics, Inc., a Colorado corporation and successor in interest by merger to IFC ("PGRA"), and Morris entered into a Second Amendment to and Confirmation of Outstanding Obligations (the "Second ACOO"). A copy of the Second ACOO is attached hereto as Exhibit 3 and incorporated herein.

19.     Pursuant to the terms of the Second ACOO, PGRA was to make a payment of $100,000 to Morris. (Exhibit 3, at ¶1).

20.     Pursuant to the Second ACOO, PGRA and Morris agreed to amend the Promissory Note to reduce the principal amount thereof to $500,000, payable in installments on or before May 1, 2010. (Exhibit 3, at ¶3).

21.     Pursuant to the Second ACOO, PGRA agreed to issue a second promissory note (the "Second Promissory Note") in the amount of $400,000 in favor of Morris. (Exhibit 3, at ¶5).

22.     Pursuant to the Second ACOO, all non-financial provisions of Stock Exchange Agreement and First Amendment were to remain unchanged and in full force and effect. (Exhibit 3, at ¶10).

23.     On December 2, 2010, IFC and Morris entered into the Third Amendment to and Confirmation of Outstanding Obligations ("Third ACOO"). The Third ACOO is attached hereto as Exhibit 4 and incorporated herein.

24.     Pursuant to the Third ACOO, IFC agreed to pay Morris $194,000 on December 3, 2010. (Exhibit 4, at ¶ 2).

25.     Pursuant to the Third ACOO, IFC agreed to pay Morris $196,000 on or before March 31, 2011. (Exhibit 4, at ¶ 3).

26.     Pursuant to the Third ACOO, IFC agreed to provide Morris with $970,000 in shares of IFC common stock. (Exhibit 4, at ¶ 4).

27.     The Third ACOO had no effect on the remaining provisions of the Second ACOO or other previous documents. (Exhibit 4, at ¶ 5).

28.     On August 2, 2012, IFC entered into an Engagement Agreement for Consulting Services (the "Engagement Agreement") between IFC and Fuselier and Co., Inc. ("Fuselier"). The Engagement Agreement is attached hereto as Exhibit 5 and is incorporated herein.

5

29.     MTI and Morris are third-party beneficiaries of the Engagement Agreement. (*See* Exhibit 5, at Exhibit B).

30.     Pursuant to the Engagement Agreement, IFC agreed, on a best efforts basis, to remove the personal guaranties made by Morris to secure MTI's equipment as soon as possible. (Exhibit 5, at Exhibit B).

31.     Pursuant to the Engagement Agreement, IFC agreed that until such time as it eliminated the personal guaranties made by Morris to secure MTI's equipment, IFC would issue new shares of stock in sufficient amounts that the economic benefit of Morris's ownership of IFC would not be diluted.  Such new shares were to be in an amount no less than $1,000,000. (Exhibit 5, at Exhibit B).

32.     Pursuant to the Engagement Agreement, IFC agreed that until such time as it eliminated the personal guaranties made by Morris to secure MTI's equipment, Morris would retain full and complete control of MTI operating decisions, including the direction of funds and personnel.  (Exhibit 5, at Exhibit B).

33.     Pursuant to the Engagement Agreement, IFC agreed to create an executive stock incentive plan in which Morris could participate. (Exhibit 5, at Exhibit B).

34.     Pursuant to the Engagement Agreement, IFC agreed that until such time as it eliminated the personal guaranties made by Morris to secure MTI's equipment, there would be no corporate overhead charges assessed against MTI without the consent of Morris. (Exhibit 5, at Exhibit B).

6

35.    Pursuant to the Engagement Agreement, IFC agreed to cooperate with Morris to effect the sale of IFC stock owned by Morris. (Exhibit 5, at Exhibit B).

36.    Pursuant to the Engagement Agreement, IFC agreed, on a best efforts basis, to pay or settle obligations created by IFC and currently secured by Morris and/or MTI. (Exhibit 5, at Exhibit B).

37.    IFC agreed to issue to Morris forty million (40,000,000) shares of IFC common stock, with a par value of $0.005. (Exhibit 5, at Exhibit B).

38.    At all times Morris and MTI have met all their obligations under the Stock Exchange Agreement, First Amendment, Second ACOO, and Third ACOO.

## IV.    CAUSE OF ACTION

### Breach of Contract

39.    Morris and MTI adopt and incorporate herein by reference each and every allegation set forth in paragraphs 1-38 above.

40.    IFC breached the Stock Exchange Agreement, the First Amendment, the Second ACOO, the Third ACOO, and the Engagement Agreement by failing to timely pay to Morris the amounts due thereunder.

41.    IFC breached the Stock Exchange Agreement, the First Amendment, the Second ACOO, the Third ACOO, and the Engagement Agreement by failing to eliminate the personal guaranties made by Morris to secure MTI's equipment.

42.    IFC breached the Stock Exchange Agreement, the First Amendment, the Second ACOO, the Third ACOO, and the Engagement Agreement by failing to provide the agreed-upon working capital to MTI.

7

43. IFC breached the Engagement Agreement by failing to pay or settle the obligations created by IFC and secured by Morris and/or MTI.

44. IFC breached the Engagement Agreement by failing to defend numerous lawsuits against IFC and MTI creating corporate overhead charges against MTI without Morris's consent.

45. IFC breached the Stock Exchange Agreement, the First Amendment, , the Second ACOO by creating corporate overhead charges against MTI without Morris's consent, including costs incurred by MTI to defend a lawsuit filed against MTI and Morris (among other parties) based on the actions of IFC and requests from IFC officers that MTI pay certain corporate overhead charges.

46. IFC breached the Engagement Agreement by failing to create an executive stock incentive plan for the benefit of Morris.

47. IFC breached the Engagement Agreement by failing to issue new shares of stock in sufficient amounts that the economic benefit of Morris's ownership of IFC would not be diluted, such new shares to be in an amount no less than $1,000,000.

48. IFC breached the Engagement Agreement by failing to cooperate with Morris to effect the sale of IFC stock owned by Morris.

49. IFC breached the Stock Exchange Agreement, the First Amendment, the Second ACOO, and the Third ACOO by violating its pledge to grant Morris full and complete control of the operating decisions of MTI, including (but not limited to)

8

purporting to pledge MTI's accounts receivable as collateral to a third party,

Luberski, Inc., with no authority to do so.

50. IFC breached the Engagement Agreement by failing to issue forty

million (40,000,000) shares of IFC common stock to Morris.

51. As a result of IFC's breach of the Stock Exchange Agreement, the First

Amendment, the Second ACOO, and the Engagement Agreement, Morris is entitled

to recission of the Stock Exchange Agreement, the First Amendment, the Second

ACOO, and any other agreement between Morris or MTI and IFC and its

predecessors and successors.

## V. DAMAGES

52. As a result of IFC's actions, MTI has been greatly damaged. The value

of MTI's business and assets have depreciated and its funds have been

misappropriated and misused.

53. IFC's breaches have impaired MTI's ability to borrow funds from

creditors and operate its business as a going concern.

54. IFC's breaches have caused MTI to lose business due to poor cash flow

and a corresponding inability to upgrade MTI's equipment.

55. So long as IFC's breaches remain uncured, the professional reputations

of MTI and Morris and the goodwill established in their professional and business

relationships suffers irreparable harm.

9

56.     Morris and MTI suffer further irreparable harm to the extent that IFC maintains some control over the affairs of MTI by virtue of its possession of MTI's stock.

## VI.   REMEDIES

57.     MTI adopts and incorporates herein by reference each and every allegation set forth in paragraphs 1-50 above.

58.     IFC's actions and failure to fulfill its obligations to Morris and MTI constitute constructive fraud warranting rescission of the Stock Exchange Agreement and all subsequent amendments thereto.

59.     Pleading individually and derivatively on behalf of MTI, Morris prays that the Court rescind the Stock Exchange Agreement for failure of consideration and to prevent unjust enrichment, and order IFC to transfer all of MTI's stock back to Morris.

60.     MTI reserves the right to file an amended complaint, to add any additional party or parties that might be determined to be necessary to a full adjudication of this action, and to otherwise plead pending discovery.

61.     Pursuant to Arkansas Code Annotated § 16-22-308, MTI is entitled to an assessment of a reasonable attorneys' fee.

WHEREFORE, Mark Morris and Morris Transportation Inc., request this Court declare that the Stock Exchange Agreement and all amendments thereto be rescinded and that MTI's stock be returned to Morris, for its fees and costs, and for all other relief.

1166916-v1

BYRD LAW FIRM
204 E. Lincoln St.
Hamburg, AR 71646
(870) 853-8225
E-MAIL: byrdlaw@sbcglobal.net

By: _____
Richard Byrd

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL: ctbohannon@wlj.com;
bdrennon@wlj.com; abrooks@wlj.com

C. Tad Bohannon (92089)
Baxter D. Drennon (2010147)
R. Aaron Brooks (2009145)

Attorneys for Mark Morris and Morris
Transportation, Inc.

11

# STOCK EXCHANGE AGREEMENT

THIS STOCK EXCHANGE AGREEMENT, made and entered into as of August 25, 2008, by and among Integrated Freight Systems, Inc., a Florida corporation, ("IFSI"), Mark Morris ("Mr. Morris") the sole stockholder of Morris Transportation, Inc., an Arkansas corporation, ("MTI"), and MTI for the purpose of its representations, warranties and deliverables set forth herein.

## WITNESSETH:

WHEREAS, IFSI is planning (a) to acquire one or more trucking companies and (b) to file a registration statement under the Securities Act of 1933 ("1933 Act) or the Securities Exchange Act of 1934 ("1934 Act"), for the purpose of becoming a "reporting company" and developing a public trading market for its common stock; and

WHEREAS, MTI is a trucking company with its headquarters office located in Hamburg, Arkansas; and

WHEREAS, IFSI desires to acquire MTI as a going concern by the means of an exchange of shares of IFSI's common stock for all of MTI's issued and outstanding equity securities ("MTI's Securities") and thereafter to operate MTI as a wholly owned subsidiary; and

WHEREAS, Mr. Morris desires to exchange all of MTI's Securities that he owns for shares of IFSI's common stock and for MTI to be acquired by IFSI, as contemplated by this Agreement; and

NOW, THEREFORE, in consideration of the premises herein before set forth, in reliance hereon and the mutual promises and respective representations and warranties of the parties, one to another made herein, and the reliance of each party upon the other(s) based hereon and other good and valuable consideration, the receipt and sufficiency of which the parties respectively acknowledge, the parties agree, for purposes of consummating the transaction(s) contemplated herein, as follows:

## ARTICLE I
## PRELIMINARY MATTERS

Section 1.01.  Recitals.  The parties acknowledge the recitals herein above set forth in the preamble are correct, and are, by this reference, incorporated herein and are made a part of this Agreement.

Section 1.02.  Exhibits and Schedules.  Exhibits (which are documents to be executed and delivered at the Closing by the party identified therein or in the provision requiring such delivery) and Schedules (which are attachments setting forth information about a party identified therein or in the provision requiring such attachment) referred to herein and annexed hereto are, by this reference, incorporated herein and made a part of this Agreement, as if set forth fully herein.

Section 1.03.  Use of words and phrases.  Natural persons may be identified by last name, with such additional descriptors as may be desirable. The words "herein," "hereby," "hereunder," "hereof," "herein before," "hereinafter" and any other equivalent words refer to this Agreement as a whole and not to any particular Article, Section or other subdivision hereof.  The words, terms and phrases defined herein and any pronoun used herein shall include the singular, plural and all genders.  The word "and" shall be con-

Page 1 of a 15 page Agreement, plus Exhibits and Schedules

EXHIBIT

1

strued as a coordinating conjunction unless the context clearly indicates that it should be construed as a copulative conjunction.

Section 1.04. Accounting terms. All accounting terms not otherwise defined herein shall have the meanings assigned to them under generally accepted accounting principles unless specifically referenced to regulatory accounting principles.

Section 1.05. Calculation of time lapse or passage; Action required on holidays. When a provision of this Agreement requires or provides for the calculation of the lapse or passage of a time period, such period shall be calculated by treating the day on which the event which starts the lapse or passage occurs as zero; provided, that this provision shall not apply to any provision which specifies a certain day for action or payment, e.g. the first day of each calendar month. Unless otherwise provided, the term "month" shall mean a period of thirty days and the term "year" shall mean a period of 360 days, except that the terms "calendar month" and "calendar year" shall mean the actual calendar period indicated. If any day on which action is required to be taken or payment is required to be made under this Agreement is not a Business Day (Business Day being a day on which national banks are open for business where the actor or payor is located), then such action or payment shall be taken or made on the next succeeding Business Day.

Section 1.06. Use of titles, headings and captions. The titles, headings and captions of articles, sections, paragraphs and other subdivisions contained herein are for the purpose of convenience only and are not intended to define or limit the contents of said articles, sections, paragraphs and other subdivisions.

## ARTICLE II
## TERMS OF THE TRANSACTIONS

Section 2.01. Stock exchange transaction. In accordance with the terms of this Agreement, on the Closing Date, IFSI shall issue to Mr. Morris shares of its common stock and Mr. Morris shall deliver to IFSI all of MTI's Securities.

Section 2.02. Consideration. In exchange for MTI's Securities, IFSI shall deliver to Mr. Morris, at Closing, (i) 2,500,000 shares of IFSI's common stock (ii) a promissory note in the principal amount of $250,000 with the terms described in Section 2.03 (iii) installment payment of $750,000 as provided in Section 2.04.

Section 2.03. Terms of promissory note. The promissory note required by clause (ii) of Section 2.02 shall have a maturity date of one year after the Closing, an interest at a rate of eight percent per annum payable at maturity and shall be convertible in lieu of payment at maturity at the election of the registered holder into additional shares of IFSI's common stock, the number of such shares determined by dividing the principal amount of and accrued interest on the note by $1; provided, that the principal amount of such note can be reduced based on performance of Net Operating Profits company remains intact, holds its own business wise, no cash put in by holding company for failing business and company remains profitable, otherwise note is reduced dollar for dollar. It is not a negative if holding company board decides to put in additional funds to bring in new business

Section 2.04 Installment payments based on performance.

(a) Within 90 days after the Closing, IFSI shall pay to Mr. Morris the sum of $750,000 in cash, provided that the date for payment of this amount shall be extended for a period not to exceed 60 days so long as IFSI is diligently pursuing refinancing of MTI's

Page 2 of a 15 page Agreement, plus Exhibits and Schedules

5512854.2 28947/1 13201

equipment to MTI's satisfaction. The $250,000 remaining balance shall be paid in a promissory note subject to performance of Net Operation Profits as described in Section 2.03.

Section 2.05. <u>Federal income tax treatment</u>. At or before the Closing Date, the parties shall agree on the value of each of the assets of MTI for federal income tax purposes and for GAAP purposes.

Section 2.06. <u>Transaction costs.</u> Each party shall pay all costs and expenses which it incurs in connection with this Agreement and the transactions contemplated hereby; except, IFSI shall pay all fees and reimbursable expenses which Mr. Morris may be obligated to pay to Cordovano and Honeck LLP, arising from its engagement as MTI's auditor.

Section 2.07. <u>Press releases</u>. No party will issue a press release regarding the subject matter of this Agreement and the transaction contemplated hereby, either before or after closing, without the prior approval thereof by the other party and its counsel.

### ARTICLE III
### <u>CLOSING OF THE TRANSACTION</u>

Section 3.01. <u>Location, date and time of the Closing</u>. The Closing of the transaction contemplated by this Agreement shall take place on September ____, 2008, at 2:00 p.m. ("Closing Date"). The Closing shall take place at a location agreed to by the parties. The acts and deliveries which occur on the Closing Date for the purpose of consummating the transactions contemplated by this Agreement and the event itself is referred to herein as the "Closing".

Section 3.02. <u>Mr. Morris's and MTI's deliveries at the Closing</u>. At the Closing, Mr. Morris and MTI will deliver to IFSI:

(a) Certificate of good standing in MTI's state of incorporation and all states in which it is required to qualify to do business;

(b) Certificates representing all of MTI's Securities;

(c) Officers' and Secretary's and Certificates of MTI in the form set forth in Exhibits "A" and "B", respectively;

(d) A resignation from any member of MTI's board of directors, other than Mr. Morris;

(e) Action by MTI's board of directors electing Paul A. Henley as a director of MTI.

(f) A document reflecting the mutual amendment of Mr. Morris's employment agreement with MTI to reflect terms of employment negotiated pursuant to this Agreement and the letter of intent between the parties dated July 1, 2008.

(g) A non-competition and confidentiality agreement executed by Mr. Morris in favor of IFSI in the form of Exhibit E.

(h) The original of MTI's corporate minute book and related documents.

Section 3.03. <u>IFSI's and Mr. Henley's deliveries at the Closing</u>. At the Closing, IFSI will deliver to Mr. Morris

(a) a certificate(s) representing 2,500,000 shares of IFSI's common stock, as provided in Section 2.02, registered in the name of Mr. Morris, or at his election jointly with

Page 3 of a 15 page Agreement, plus Exhibits and Schedules

his spouse, provided the election together with the name and social security number of his spouse or any other designee that Mr. Morris shall designate is delivered to IFSI not less than five business days prior to the Closing; and

(b) Action by IFSI's board of directors electing Mr. Morris as a director of IFSI;

(c) Officers' and Secretary's Certificates of IFSI in the form set forth in Exhibits "A" and "B", respectively; and

(d) An Employment Agreement in the form set forth in Exhibit "F".

Section 3.04. <u>Closing Memorandum and receipts</u>. As evidence that all parties deem the Closing to have been completed and the transactions contemplated by this Agreement to have been consummated, the parties jointly will execute and deliver a Closing Memorandum, in the form of Exhibit "C", acknowledging such completion and consummation.

Section 3.06. <u>Waiver of conditions</u>. Notwithstanding Section 12.03, any condition to the Closing which is to the benefit of any party and which is not satisfied prior to or at the Closing, excluding nevertheless any provision of this Agreement which by its terms is to be performed in the future, will be deemed to be waived by the benefited party or otherwise satisfied and waived by virtue of that party executing the Closing Memorandum, except to the extent any such unsatisfied or unperformed condition is expressly preserved by listing it in the Closing Memorandum for satisfaction or performance after the Closing.

Section 3.07. <u>Further assurances.</u> At any time and from time to time after the Closing, at the reasonable request of any party and without further consideration, any other party(ies) shall execute and deliver such other instruments and documents reasonably desirable or necessary to complete and confirm the transactions contemplated by this Agreement.

Section 3.08. <u>Conditions precedent to IFSI's obligation to Close</u>. All obligations of IFSI hereunder are subject, at the option of IFSI, to the fulfillment of each of the following conditions at or prior to the Closing, and MTI shall exert commercially reasonable efforts to cause each such conditions to be so fulfilled:

(a) All representations and warranties of MTI and of Mr. Morris contained herein and in any document delivered pursuant hereto shall be true and correct in all material respects when made and shall be deemed to have been made again and given at and as of the date of the Closing of the transaction contemplated by this Agreement, and shall then be true and correct in all material respects, except for changes in the ordinary course of business after the date hereof in conformity with the representations, covenants and agreements contained herein.

(b) All covenants, agreements and obligations required by the terms of this Agreement to be performed by MTI and of Mr. Morris at or before the Closing shall have been duly and properly performed in all material respects to IFSI's reasonable satisfaction.

(c) Since the date of this Agreement there shall not have occurred any Material Adverse Effect. The term "Material Adverse Effect" shall mean any material adverse

change in MTI or its operating or financial condition, prospects (financial or otherwise), business, properties or assets of MTI.

(d) All documents required to be delivered to IFSI at or prior to the Closing shall have been so delivered.

(e) The transaction contemplated by this Agreement shall have been approved in writing by MTI's board of directors.

(f) MTI shall have not suffered or incurred a material damage, destruction or loss not fully covered by insurance and which has a materially adverse affect on its business and operations.

(g) IFSI shall have received a certificate of good standing for MTI and each subsidiary issued by the secretary of state of its state of organization and of each state in which it and its subsidiary is qualified or required to be qualified to do business as a foreign corporation.

(i) IFSI shall have received financial statements of MTI for December 31, 2006 and 2007 and for each of the interim quarterly periods ended subsequent thereto prepared in accordance with generally accepted accounting principles, which interim quarterly period shall not show any materially adverse results of operation when compared to 2007, the financial condition and performance of MTI disclosed in such financial statements being to the reasonable satisfaction of IFSI in relation to financial statements delivered prior to execution and delivery of this Agreement.

Section 3.09.  Conditions precedent to the MTI obligation to Close.  All obligations of MTI at the Closing are subject, at the option of MTI, to the fulfillment of each of the following conditions at or prior to the Closing, and IFSI shall exert commercially reasonable efforts to cause each such conditions to be so fulfilled.

(a) All representations and warranties of IFSI contained herein or in any document delivered pursuant hereto shall be true and correct in all material respects when made and as of the Closing.

(b) All covenants, agreements and obligations required by the terms of this Agreement to be performed by IFSI at or before the Closing shall have been duly and properly performed in all material respects to MTI and Mr. Morris's reasonable satisfaction.

(c) All documents required to be delivered to MTI at or prior to the Closing shall have been so delivered.

(d) The transaction contemplated by this Agreement shall have been approved in writing by IFSI's board of directors.

(e) MTI shall have received a certificate of good standing for IFSI issued by the secretary of state of its state of organization and of each state in which it is qualified or required to be qualified to do business as a foreign corporation.

(f) MTI shall have received audited financial statements of IFSI that will be complete and available coincidentally with the MTI audit and will be for the same period, ending with the quarter preceding the Closing.  The audits are to be available prior to funding.

Page 5 of a 15 page Agreement, plus Exhibits and Schedules

5512854.2 28947/11 201

(g) MTI shall have received a listing of IFSI's shareholders and/or investors.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF THE PARTIES

Section 4.01. Representations and warranties of MTI and Mr. Morris. Each of MTI (as used in the following representations and warranties with respect to status or condition, "MTI" includes every subsidiary of MTI, all of which are identified in Schedule A) and Mr. Morris represent and warrant, jointly and severally, to IFSI, as follows:

(a) MTI is a duly organized and an existing entity in good standing under the laws of its state of incorporation and has full corporate power to execute, deliver and perform this Agreement.

(b) MTI is qualified to do business and in good standing in each state and jurisdiction in which the nature of its activities and ownership of property require it to be qualified as a foreign corporation.

(c) All licenses required for the conduct of MTI's businesses in intra and interstate commerce are in full force and effect, all such licenses being transferable in the event the transactions contemplated pursuant to this Agreement are deemed to be a transfer under applicable statutes and regulations; and, there is no proceeding of any nature pending or, to the best knowledge of MTI and Morris, threatened which if determined adversely to MTI would result in a revocation, cancellation of or material limitation or restriction on MTI and the conduct of its or any subsidiary's business as it is presently conducted.

(d) This Agreement has been duly and validly authorized, executed and delivered by MTI and constitutes the legal, valid and binding obligation of MTI enforceable against it, in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, reorganization and other laws of, relating to or affecting stockholders and creditors rights generally and to general equitable principles.

(e) To the best knowledge of MTI and Morris, the execution of this Agreement and consummation of the transactions contemplated hereby does not conflict with and will not result in any adverse consequences to or material breach of any agreement (financing or otherwise), mortgage, instrument, judgment, decree, law or governmental regulation, license, permit or authorization by MTI or in the loss, forfeiture or waiver of any rights, license, authorization or franchise owned by MTI, from which MTI benefits or which is desirable in the conduct of MTI's business.

(f) To the best knowledge of MTI and Morris, except for such actions as may have been taken, no further action by or before any governmental body or authority of the United States of America or any state or subdivision thereof or any self-regulatory body to which MTI is subject is required in connection with the execution and delivery of this Agreement by MTI and the consummation of the transactions contemplated hereby.

(g) The information MTI has delivered to IFSI relating to MTI was, to the best knowledge of MTI and Morris, on the date reflected in each such item of information accurate in all material respects and, to the best knowledge of MTI and Morris, such information at the date hereof taken as a whole provides full and fair disclosure of all material information relating to MTI and does not, to the best knowledge of MTI and Morris,

Page 6 of a 15 page Agreement, plus Exhibits and Schedules

omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(h) MTI has conducted its business in the ordinary course for the last three years or since inception, whichever is less.

(i) Neither MTI nor any employee, to MTI best knowledge, has since inception given or agreed to give any gift or similar benefit valued at more than $20 annually to any customer, supplier, governmental employee or other person who is or may be or have been in a position to help or hinder MTI's business, or a gift or similar benefit in any amount or value which might subject MTI to damage or penalty in civil, criminal or governmental litigation or proceedings.

(j) MTI's financial statements delivered to IFSI have been prepared in accordance with generally accepted accounting principles consistently applied and maintained throughout the periods indicated, fairly present the financial condition of MTI in all material respects at the dates and the results of operations for the periods indicated, contain all normally recurring adjustments and do not omit to disclose any contingent, undisclosed or hidden liabilities. MTI's financial records are maintained in accordance with good business practice.

(k) MTI has good, marketable and insurable title to all of its properties and assets, including intangible assets, if any, which it owns or uses in its business or purports to own, including, without limitation, those reflected in its books and records and in the balance sheet, both tangible and intangible None of the properties and assets are subject to any mortgage, pledge, lien, charge, security interest, encumbrance, restriction, lease, license, easement, liability or adverse claim of any nature whatsoever, direct or indirect, whether accrued, absolute, contingent or otherwise, except as expressly set forth in the notes to MTI's financial statements as securing specific liabilities or subject to specific capital leases and have arisen only in the ordinary course of business. All of the properties and assets owned, leased or used by MTI are in good operating condition and repair, are suitable for the purposes used, are adequate and sufficient for MTI's current operations and are directly related to MTI's business.

(l) All of the material contracts, agreements, leases, licenses and commitments of MTI (other than those which have been fully performed), copies of all of which have been delivered to IFSI, are valid and binding, enforceable in accordance with their respective terms, in full force and effect and there is not there under with respect to any party thereto any existing default or event, which after the giving of notice or lapse of time or both, would constitute a default or result in a right to accelerate or loss of rights and none of such contracts, agreements, leases, licenses and commitments is, either when considered singly or in the aggregate with others, unduly burdensome, onerous or materially adverse to MTI's business, properties, assets, earnings or prospects, either before or after the Closing, or which would result in any material loss to or liability of MTI.

(m) There is no claim, legal action, suit, arbitration, governmental investigation, or other legal or administrative proceeding, nor any order, decree, judgment or judgment in progress, pending or in effect or to MTI's knowledge threatened, against or relating to MTI, its directors, officers or employees with respect to MTI or its business or for which MTI may have an indemnity obligation, it properties, assets or business or the transaction contemplated by this Agreement and MTI does not know or have any reason to be aware

Page 7 of a 15 page Agreement, plus Exhibits and Schedules

of any basis for the same, including any basis for a claim of sexual harassment or racial or age discrimination.

(n) All taxes, including without limitation, income, property, special assessments, sales, use, franchise, intangibles, employees' income withholding and social security taxes, including employer's contribution, other than those for which a return or deposit is not yet due and have been disclosed to IFSI, imposed by the United States or any state, municipality, subdivision, authority, which are due and payable, and all interest and penalties thereon unless disputed in good faith in proper proceedings and reserved for or set aside, have been paid in full and all tax returns required to be filed in connection therewith have been accurately prepared and timely filed and all deposits required by law to be made by MTI with respect to employees' withholding and social security taxes have been made. MTI is not and has no reason to believe that it will be the subject of an audit by any taxing authority. There is not now in force any extension of time with respect to the date when tax return was or is due to be filed, or any waiver or agreement by MTI for the extension of time for the assessment of any tax and MTI is not a "consenting corporation" within the meaning of Section 341(f)(1) of the Tax Code.

(o) MTI does not have any employee benefit, pension or profit sharing plans subject to ERISA and no such plans to which MTI is obligated or required to make contributions.

(p) None of MTI's employees are represented by a collective bargaining agent or subject to a collective bargaining agreement and MTI considers its relations with its employees as a whole to be good. MTI has disclosed to IFSI all employee salary, compensation and benefit agreements and no employee, other than Morris, has a written employment agreement.

(q) No person has guaranteed any obligation of MTI, and MTI has not guaranteed the obligation of any other person.

(r) MTI and its management have no reason to believe or expect and do not believe or expect that any event or events will occur which will result in MTI producing results of operations which are materially different from MTI's recent operations.

(s) Mr. Morris will have operational control through a proxy or other mechanism, to operate MTI in all daily operations as an ongoing concern with authority to carry out those duties, barring interference with IFSI's overall objectives.

Section 4.02. IFSI's representations and warranties. IFSI represents and warrants to IFSI that:

(a) IFSI is a duly incorporated and existing corporation in good standing under the laws of its state of incorporation and has full corporate power to execute and deliver this Agreement.

(b) This Agreement has been duly and validly authorized, executed and delivered by IFSI and constitutes the legal, valid and binding obligation of IFSI, enforceable against IFSI in accordance with its terms subject, as to enforceability, to bankruptcy, insolvency, reorganization and other laws of, relating to or affecting shareholders and creditors rights generally and to general equitable principles.

(c) Except for such actions as may have already been taken, no further action by or before any governmental body or authority of the United States of America or any state

Page 8 of a 15 page Agreement, plus Exhibits and Schedules

thereof is required in connection with the execution and delivery of this Agreement by IFSI and the consummation of the transactions contemplated hereby.

(d) The information IFSI have delivered to MTI was on the date reflected in each such item of information accurate in all material respects and such information at the date hereof as a whole did not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(e) The information and financial statements IFSI has provided to Morris, on the date reflected in each element of information and financial statements, are accurate in all material respects and, to the knowledge of IFSI, such information at the date hereof taken as a whole provides, to the best knowledge of IFSI, full and fair disclosure of all material information relating to MTI and does not, to the knowledge of IFSI omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 4.03.  Nature and survival of representation and warranties; Remedies.  All statements of fact contained in this Agreement, any certificate delivered pursuant to this Agreement, or any letter, document or other instrument delivered by or on behalf of MTI or of IFSI, and their respective officers, pursuant to the terms of this Agreement shall be deemed representations and warranties made by MTI or by IFSI, respectively, as the case may be, to each other under this Agreement.  For purposes of this Section 4.03 and Section 11.01 only, any party or other person seeking to enforce, or claiming the benefit of, any representation and warranty under this Agreement is called a Claimant, and any party or other person against whom a right is claimed is called a Defendant.  All representations and warranties of the parties shall survive the Closing; provided, however, that all representations and warranties shall terminate and expire, and be without further force and effect whatever from and after the one year from the date hereof, and neither IFSI, or MTI shall have any liability whatsoever on account of any inaccurate representation or warranty or for any breach of warranty, unless a Claimant shall, on or prior to the expiration of such one year period, serve written notice on a Defendant, with a copy to the Defendant's counsel, setting forth in reasonable detail the breach and any direct, incidental or consequential damages (including amounts) the Claimant may have suffered as a result of such breach.

## ARTICLE V
## COVENANTS OF THE PARTIES

Section 5.01.  Conduct of business prior to Closing.

(a) From the date hereof to the Closing, MTI will conduct its business and affairs only in the ordinary course and consistent with its prior practice and shall endeavor to maintain, keep and preserve its assets and properties in good condition and repair and maintain insurance thereon in accordance with present practices, it will use its best efforts (i) to preserve its business and organization intact, (ii) to keep available to IFSI the services of MTI's present employees, agents and independent contractors, (iii) to preserve for the benefit of IFSI the goodwill of suppliers, customers, distributors, landlords and others having business relations with it, and (iv) to cooperate and use reasonable efforts to obtain the consent of any landlord or other party to any lease or contract with MTI

Page 9 of a 15 page Agreement, plus Exhibits and Schedules

where the consent of such landlord or other party may be required by reason of the transactions contemplated hereby.

(b) From the date hereof to the Closing, MTI shall not outside the ordinary course of business (i) dispose of any material assets, (ii) engage in any extraordinary transactions without IFSI's prior approval, including but not limited to, directly or indirectly, soliciting, entertaining, encouraging inquiries or proposals or entering into negotiation or agreement with any third party for sale of assets by MTI, sale of its equity securities or merger, consolidation or combination with any company, (iii) grant any salary or compensation increase to any employee, or (iv) make any commitment for capital expenditures, other than as disclosed to IFSI and approved by it.

(c) IFSI shall open its corporate records and financial books to MTI for its or its agents and representatives review.

Section 5.02. <u>Notice of changes in information</u>. Each party shall give the other party prompt written notice of any change in any of the information contained in their respective representations and warranties made in Article IV, or elsewhere in this Agreement, or the exhibits and schedules referred to herein or any written statements made or given in connection herewith which occurs prior to the Closing.

Section 5.03. <u>Notice of extraordinary changes</u>. MTI shall advise IFSI with respect to any of the following events outside of ordinary course of business and which are materially adverse: (i) the entering into and cancellation or breach of contracts, agreements, licenses, commitments or other understandings or arrangements to which MTI is a party, (ii) any changes in purchasing, pricing or selling policy, or, any changes in its sales, business or employee relations in general, and (iii) the filing or commencement of any litigation or governmental or agency proceedings against MTI.

Section 5.04. <u>Action to preserve MTI's business and assets</u>. Notwithstanding anything contained in this Agreement to the contrary, MTI will not take or fail to take any action that in MTI's reasonable business judgment, is likely to give rise to a substantial penalty or a claim for damages by any third party against MTI, or is likely to result in losses, or is otherwise likely to prejudice in any material respect or unduly interfere with the conduct of its business and operations in the ordinary course consistent with prior practice, or is likely to result in a breach by MTI of any of its representations, warranties or covenants contained in this Agreement (unless any such breach is first waived in writing by IFSI).

Section 5.05. <u>Access to information and documents</u>. Upon reasonable notice and during regular business hours, MTI will give to IFSI, its attorneys, accountants and other representatives full access to its personnel (subject to reasonable approval as to the time thereof) and all properties, documents, contracts, books and records and will furnish copies of such documents (certified by officers, if so requested) and with such information with respect to its business, operations, affairs and prospects (financial and otherwise) as IFSI may from time to time request, and the party to whom the information is provided will not improperly disclose the same prior to the Closing. MTI will afford IFSI an opportunity to ask questions and receive answers thereto in furtherance of its duly diligent examination of MTI. Any such furnishing of such information or any investigation shall not affect that party's right to rely on the other party's representations and warranties made in this Agreement or in connection herewith or pursuant hereto, except to the extent that written

5512854.2 28947/11/201

disclosure of information at a variance or in conflict with any such representation or warranty is made and provides specific notice of such variance or conflict.

Upon reasonable notice and during regular business hours, IFSI will give to MTI, its attorneys, accountants and other representatives full access to its personnel (subject to reasonable approval as to the time thereof) and all properties, documents, contracts, books and records and will furnish copies of such documents (certified by officers, if so requested) and with such information with respect to its business, operations, affairs and prospects (financial and otherwise) as MTI may from time to time request, and the party to whom the information is provided will not improperly disclose the same prior to the Closing. IFSI will afford MTI an opportunity to ask questions and receive answers thereto in furtherance of its duly diligent examination of IFSI. Any such furnishing of such information or any investigation shall not affect that party's right to rely on the other party's representations and warranties made in this Agreement or in connection herewith or pursuant hereto, except to the extent that written disclosure of information at a variance or in conflict with any such representation or warranty is made and provides specific notice of such variance or conflict.

Section 5.06. <u>Confidential treatment of information</u>. The provisions of Exhibit "D" shall be binding upon the parties.

Section 5.07. <u>Cooperation by the parties</u>. Each party hereto shall cooperate and shall take such further action as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement. MTI shall cooperate with IFSI, and its independent public accountant, the cost of which shall be the responsibility of IFSI, with respect to an audit of MTI's financial statements and review of interim, stub period financial statements required to enable IFSI to file a registration statement pursuant to the 1933 Act or the 1934 Act. This covenant shall survive the Closing.

Section 5.08. <u>Conduct of MTI's business after Closing</u>.

(a) The parties acknowledge that it is IFSI's intent to cause MTI to refinance all of its equipment following the closing, subject to terms and conditions of such refinancing acceptable to IFSI, for the purpose of eliminating personal guaranties and to improve MTI's working capital.

(b) MTI will be operated as a wholly owned subsidiary of IFSI, and as a separate corporation, and shall not be merged into IFSI or any other subsidiary of IFSI at least until IFSI has paid the additional consideration provided in Section 2.03.

(c) In the event IFSI fails (i) to either pay the sum of $750,000 as provided in Section 2.03(a) or refinance MTI's equipment within 90 days of Closing with a 60 day extension as provided in Section 2.04 or (ii) to established a public trading market for its common stock within 180 days following funding, provided that the number of days shall be extended for a period not to exceed 60 days so long as IFSI is diligently pursuing establishing a public trading market for IFSI stock, Mr. Morris may elect, by written notice given to IFSI within ten days after either such failure, to return to IFSI the IFSI common stock he received pursuant to Section 2.02 and any cash consideration received pursuant to Section 2.03, without interest, offset or deduction, and IFSI will, upon such election, return MTI's Securities to Mr. Morris.

ARTICLE VII

<u>FEDERAL INCOME TAX MATTERS</u>

Page 11 of a 15 page Agreement, plus Exhibits and Schedules

Section 7.01. <u>Federal income tax treatment</u>. Each party shall be responsible for obtaining his, her or its own tax advice with respect to and understanding the federal income tax consequences of the transactions and the federal income tax consequences thereof contemplated by this Agreement and waives any reliance with respect thereto on any other party. Mr. Morris understands the transaction will be taxable to him to the extent of "boot".

## ARTICLE VIII
## SECURITIES LAW MATTERS AND STATUS OF SHARES

Section 8.01. <u>Unregistered shares</u>. IFSI's common stock delivered to Mr. Morris is not being registered under the 1933 Act and the securities laws of Arkansas or any other state of jurisdiction, and the shares are not transferable, except as permitted under various exemptions contained in the 1933 Act and applicable state securities law. The provisions contained in the following sections are intended to ensure compliance with the 1933 Act and applicable state securities law.

Section 8.02. <u>No transfers in violation of 1933 Act</u>. Mr. Morris will agree at Closing not to offer, sell, assign, pledge, hypothecate, transfer or otherwise dispose of IFSI's shares, except after full compliance with all of the applicable provisions of and regulations under the 1933 Act and applicable state securities law.

Section 8.03. <u>Investment intent</u>. Mr. Morris will represent and warrant to and covenant with IFSI that he is acquiring IFSI's shares for his own account for investment and not with a view to resale or other distribution; that he currently has no intention of selling, assigning, transferring, pledging, hypothecating or otherwise disposing of all or any part thereof at any particular time, for any particular price, or on the happening of any particular event or circumstance; and he will acknowledge that he understands IFSI is relying on the truth and accuracy of his covenants, warranties and representations in issuing IFSI's shares without first registering them under the 1933 Act.

Section 8.04. <u>Investment legend on certificates</u>. Mr. Morris will further agree that the certificates evidencing IFSI's shares shall contain the following legend or a legend of similar import:

> THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND IS A "RESTRICTED SECURITY" AS DEFINED UNDER SAID ACT. ACCORDINGLY, NEITHER THIS SECURITY NOR ANY INTEREST THEREIN MAY BE SOLD, OFFERED FOR SALE, ASSIGNED, TRANSFERRED, PLEDGED OR HYPOTHECATED, EXCEPT BY BONA FIDE GIFT OR INHERITANCE, IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS SECURITY UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED.

## ARTICLE IX
## TERMINATION PRIOR TO CLOSING

Section 9.01. <u>Termination for default</u>. IFSI may, by notice to MTI and Morris given in the manner provided below on or at any time prior to the Closing Date, terminate this Agreement if default shall be made by MTI in the observance or in the due and timely performance of any of any material covenants and agreements contained in this Agreement, made by MTI pursuant to or imposed upon it in this Agreement, if the default has not been fully cured within fifteen days after receipt of the notice specifying the default.

Page 12 of a 15 page Agreement, plus Exhibits and Schedules

MTI may, by notice to IFSI given in the manner provided below on or at any time prior to the Closing Date, terminate this Agreement if default shall be made by IFSI in the observance or in the due and timely performance of any of any material covenants and agreements contained in this Agreement, made by IFSI pursuant to or imposed upon it in this Agreement, if the default has not been fully cured within fifteen days after receipt of the notice specifying the default.

Section 9.02. Termination for failure to Close. If the Closing does not occur on or before the date provided in Section 3.01, any party, if that party is not then in default in the observance or in the due or timely performance of any covenants and conditions under this Agreement, may at any time terminate this Agreement by giving written notice to the other parties; provided, that the parties may extend the Closing date in writing.

Section 9.03. Termination for loss of bargain. IFSI may, at its option, terminate this Agreement prior to the Closing if (i) in completion of its due diligence examination of MTI, it discovers the existence of a material, adverse variance from its due diligence examination prior to the date of this Agreement, or (ii) the business or assets of MTI have suffered any material damage, destruction or loss (whether or not covered by insurance), or (iii) MTI is prevented by order of court or administrative action from consummating the transactions contemplated by this Agreement, whether or not MTI has exhausted its appeals.

MTI may, at its option, terminate this Agreement prior to the Closing if (i) in completion of its due diligence examination of IFSI, it discovers the existence of a material, adverse variance from its due diligence examination prior to the date of this Agreement, or (ii) the business or assets of IFSI have suffered any material damage, destruction or loss (whether or not covered by insurance), or (iii) IFSI is prevented by order of court or administrative action from consummating the transactions contemplated by this Agreement, whether or not IFSI has exhausted its appeals.

## ARTICLE X
## NOTICES

Section 10.01. Procedure for giving notices. Any and all notices or other communications required or permitted to be given under any of the provisions of this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered (excluding telephone facsimile and including receipted express courier and overnight delivery service) or mailed by first class certified U.S. mail, return receipt requested showing name of recipient, addressed to the proper party.

Section 10.02. Addresses for notices. For purposes of sending notices under this Agreement, the addresses of the parties are as follows:

As to MTI and Mr. Morris:              Mark Morris, President
                                       Morris Transportation, Inc.
                                       728 Highway 52 West
                                       Hamburg, AR 71646

Copy to:                               Gary J. Barrett, Esq.
                                       Hancock, Lane & Barrett, PLLC

Page 13 of a 15 page Agreement, plus Exhibits and Schedules

610 E. 6th St.
Little Rock, AR 72202

As to IFSI:

Paul A. Henley, President
Integrated Freight Systems, Inc.
Suite 192
1767 Lakewood Ranch Boulevard
Bradenton, FL 34211

Copy to:

Jackson L. Morris, Esq.
3116 West North A Street
Tampa, Florida 33609-1544

Section 10.03. Change of address. A party may change its address for notices by sending a notice of such change to all other parties by the means provided in Section 10.01.

## ARTICLE XI
## LEGAL AND OTHER COSTS

Section 11.01. Party entitled to recover. In the event that any party (the "Defaulting Party") defaults in his or its obligation under this Agreement and, as a result thereof, the other party (the "Non-Defaulting Party") seeks to legally enforce his or its rights hereunder against the Defaulting Party (whether in an action at law, in equity or in arbitration), then, in addition to all damages and other remedies to which the Non-Defaulting Party is entitled by reason of such default, the Defaulting Party shall promptly pay to the Non-Defaulting Party an amount equal to all costs and expenses (including reasonable attorneys' fees and expert witness fees) paid or incurred by the Non-Defaulting Party in connection with such enforcement.

Section 11.02. Interest. In the event the Non-Defaulting Party is entitled to receive an amount of money by reason of the Defaulting Party's default hereunder, then, in addition to such amount of money, the Defaulting Party shall promptly pay to the Non-Defaulting Party a sum equal to interest on such amount of money accruing at the rate of 1.5% per month during the period between the date such payment should have been made hereunder and the date of the actual payments thereof.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01. Effective date. The effective date of this Agreement shall for all purposes be the date set forth in first paragraph hereof notwithstanding a later actual date of execution by any individual party.

Section 12.02. Entire agreement. This writing constitutes the entire agreement of the parties with respect to the subject matter hereof, superseding all prior agreements, understandings, representations and warranties.

Section 12.03. Waivers. No waiver of any provision, requirement, obligation, condition, breach or default hereunder, or consent to any departure from the provisions hereof, shall be considered valid unless in writing and signed by the party giving such waiver, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

Page 14 of a 15 page Agreement, plus Exhibits and Schedules

Section 12.04. Amendments. This Agreement may not be modified, amended or terminated except by a written agreement specifically referring to this Agreement signed by all of the parties hereto and amendment, modification or alteration of, addition to or termination of this Agreement or any provision of this Agreement shall not be effective unless it is made in writing and signed by the parties.

Section 12.05. Construction. This Agreement has been negotiated by the parties, section by section, and no provision hereof shall be construed more strictly against one party than against the other party by reason of such party having drafted such provision. The order in which the provisions of this Agreement appear are solely for convenience of organization, and later appearing provisions shall not be construed to control earlier appearing provisions.

Section 12.06. Invalidity. It is the intent of the parties that each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. If any provision hereof shall be prohibited, invalid, illegal or unenforceable, in any respect, under applicable law, such provision shall be ineffective to the extent of such prohibition, invalidity or non enforceability only, without invalidating the remainder of such provision or the remaining provisions of this Agreement; and, there shall be substituted in place of such prohibited, invalid, illegal or unenforceable provision a provision which nearly as practicable carries out the intent of the parties with respect thereto and which is not prohibited and is valid, legal and enforceable.

Section 12.07. Multiple counterparts. This Agreement may be executed in one or more counterparts, each of which shall be an original and, taken together, shall be deemed one and the same instrument.

Section 12.08. Assignment, parties and binding effect. This Agreement, and the duties and obligations of any party shall not be assigned without the prior written consent of the other party(ies). This Agreement shall benefit solely the named parties and no other person shall claim, directly or indirectly, benefit hereunder, express or implied, as a third-party beneficiary, or otherwise. Wherever in this Agreement a party is named or referred to, the successors (including heirs and personal representative of individual parties) and permitted assigns of such party shall be deemed to be included, and all agreements, promises, covenants and stipulations in this Agreement shall be binding upon and inure to the benefit of their respective successors and permitted assigns.

Section 12.09. Survival of representations and warranties. The representations and warranties made herein shall survive the execution and delivery of this Agreement and full performance hereunder of the obligations of the representing and warranting party, subject to the provisions of Section 4.03.

Section 12.10. Jurisdiction and venue. Any action or proceeding for enforcement of this Agreement and the instruments and documents executed and delivered in connection herewith which is determined by a court of competent jurisdiction not, as a matter of law, which seeks injunctive relief shall be brought and enforced in the courts of the State of Arkansas in and for Ashley County, Arkansas, and the parties irrevocably submit to the jurisdiction of each such court in respect of any such action or proceeding.

Section 12.11. Applicable law. This Agreement and all amendments thereof shall be governed by and construed in accordance with the law of the State of Arkansas ap-

Page 15 of a 15 page Agreement, plus Exhibits and Schedules

plicable to contracts made and to be performed therein (not including the choice of law rules thereof).

[Testimonium on following page.]

Page 16 of a 15 page Agreement, plus Exhibits and Schedules

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be signed by their respective officers thereunto duly authorized and their respective corporate seals to be hereunto affixed, the day and year first above written.

[Corporate Seal]

Integrated Freight Systems, Inc.

Attest:

By: _____
      Paul A. Henley, President

_____, Secretary

[Corporate Seal]

Morris Transportation, Inc.

Attest:

By: _____
      Mark Morris, President

_____, Secretary

Mark  Morris

Page 17 of a 15 page Agreement, plus Exhibits and Schedules

## AMENDMENT TO
## STOCK EXCHANGE AGREEMENT

THIS AMENDMENT TO STOCK EXCHANGE AGREEMENT dated as of September 2, 2008, ("Exchange Agreement") made and entered into as of September 17, 2008, by and among Integrated Freight Systems, Inc., a Florida corporation, ("IFSI"), Mark Morris ("Mr. Morris") the sole stockholder of Morris Transportation, Inc., an Arkansas corporation, ("MTI"), and MTI.

### W I T N E S S E T H :

WHEREAS, the parties to the Exchange Agreement deem the transactions contemplated by the Exchange Agreement to have been closed on September 2, 2008, the Closing Date; and

WHEREAS, the parties desire to amend the Exchange Agreement for the purpose of making ISFI's affairs more acceptable to public and private investors, in particular by eliminating the feature contained in Section 5.08(c), and restructuring the consideration payable to Mr. Morris;

NOW, THEREFORE, in consideration of the premises herein before set forth, in reliance hereon and the mutual promises, one to another made herein, and the reliance of each party upon the other(s) based hereon and other good and valuable consideration, the receipt and sufficiency of which the parties respectively acknowledge, the parties agree, for purposes of amending the Exchange Agreement and the transaction(s) contemplated therein, as follows:

Section 2.02(i) of the Exchange Agreement is amended to change the number of shares to 3,000,000 shares from 2,500,000 shares.

Sections 2.02(ii) and 2.04 of the Exchange Agreement are amended to change the principal amount of the promissory note to $600,000 from $250,000.

Section 2.02(iii) and 2.04 of the Exchange Agreement are amended to change the amount of the installment payment to $150,000 from $750,000, payable on or before January 1, 2009.

Section 2.03 of the Exchange Agreement is amended by adding a clause providing:

the promissory note shall be secured by a pledge of and first priority security interest in the MTI Securities exchanged with IFSI by the noteholder under the Exchange Agreement.  In the event ISFI fails to pay a promissory note at maturity and the noteholder takes the pledged MTI Securities in satisfaction thereof, then the noteholder shall return to ISFI all of ISF"s common stock the noteholder received under the Exchange Agreement; and, IFSI shall and hereby does grant a proxy to Mr. Morris to vote the MTI Securities until the promissory note is paid in full.

Sections 3.02 and 3.03 of the Exchange Agreement are amended and re respectively, as set forth in the attached Schedule of Deliverables.

Section 5.08(a) is amended and restated, as follows:

The parties acknowledge that it is IFSI's intent to cause MTI to refinance, between the Reset Date and not later than sixty days following the effective date

EXHIBIT
2

of IFSI's first registration statement on Form S-1 filed with the U.S. Securities and Exchange Commission, all of its equipment, subject to terms and conditions of such refinancing acceptable to IFSI, for the purpose of eliminating personal guaranties and to improve MTI's working capital.

Section 5.08 of the Exchange Agreement is amended to add a new paragraph (d) which provides:

Within 90 days following the Reset Date, IFSI will provide $100,000 of working capital to MTI. In the event, IFSI is unsuccessful in refinancing MTI's equipment within the time period set forth in Section 5.08(a), as amended, IFSI will provide an additional $100,000 of working capital to MTI and make a cash payment of $50,000 to Mr. Morris.

Sections 3.02(f) and 3.03(d) of the Exchange Agreement are amended by setting Mr. Morris' salary in his employment agreement at $110,000 per year, with a cash bonus of $25,000 to be paid on or before January 31, 2009.

Section 5.08(c) is deleted in its entirely.

A new Section 5.09 is added to the Exchange Agreement which states:

Payment to Mr. Morris after Closing. IFSI will pay to Mr. Morris the amount of $250,000 thirteen months after the Reset Date, provided that the amount will be reduced by the difference, if any, derived by subtracting (a) MTI's net revenues for the twelve month period ending on the last day of the month preceding 365th day after the Closing Date from (b) the net revenues the twelve month period ended on the last day of the month preceding the Closing Date, but only if (a) is less than (b), (such net revenue amounts subject in each case to normally occurring and extraordinary accounting adjustments, as made in accordance with GAAP at the fiscal year end in which the respective twelve month periods end).

A new Section 8.05 is added to the Exchange Agreement which states:

Restrictions on sale of IFSI's common stock. Mr. Morris shall not sell, transfer, assign or hypothecate any of IFSI's common stock until the promissory note issued pursuant to Section 2.02(iii), as amended, has been paid in full.

The parties acknowledge that it was their respective intents to Close the exchange transaction as of September 2, 2008. In view of these amendments to the Exchange Agreement and the incomplete deliveries made on and after the Closing Date as of September 2, 2008, the parties agree that the deliveries made at and after that Closing date shall be deemed to be held in escrow, subject to completion and deliveries of such documentation in accordance with the Schedule of Deliverables attached hereto and that all time periods beginning on and running from the Closing Date as provided in the Exchange Agreement shall be deemed to begin on and run from the date of this Amendment (the "Reset Date").

[Testimonium on following page.]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their respective officers thereunto duly authorized and their respective corporate seals to be hereunto affixed, the day and year second above written.

| [Corporate Seal] | Integrated Freight Systems, Inc. |
|---|---|
| Attest: | |
| Jackson L. Morris, Secretary | By: _____<br>    Paul A. Henley, President |
| [Corporate Seal] | Morris Transportation, Inc. |
| Attest: | By: |
| [Insert name], Secretary | Mark Morris, President |
| | Mark Morris |

## Schedule of Deliverables
### Stock Exchange Agreement re: Smith Systems Transportation, Inc.

Exchange Agreement signed by   ☐  Morris and   ☐  Integrated.

Closing Memorandum signed by   ☐  Morris and   ☐  Integrated.

Exchange Agreement Amendment signed by   ☐  Smiths and   ☐  Integrated.

Section 3.02.  Mr. Morris's and MTI's deliveries at the Closing.  At the Closing, Mr. Morris and MTI will deliver to IFSI:

☐ (a) Certificate of good standing in MTI's state of incorporation and all states in which it is required to qualify to do business;

☐ (b) Certificates representing all of MTI's Securities;

☐ (c) Officers' and Secretary's and Certificates of MTI in the form set forth in Exhibits "A" and "B", respectively;

☐ (d) A resignation from any member of MTI's board of directors, other than Mr. Morris;

☐ (e) Action by MTI's board of directors electing Paul A. Henley as a director of MTI.

☐ (f) A document reflecting the mutual amendment of Mr. Morris's employment agreement with MTI to reflect terms of employment negotiated pursuant to this Agreement and the letter of intent between the parties dated July 1, 2008.

☐ (g) A non-competition and confidentiality agreement executed by Mr. Morris in favor of IFSI in the form of Exhibit E.

☐ (h) The original of MTI's corporate minute book and related documents.

Section 3.03.  IFSI's and Mr. Henley's deliveries at the Closing.  At the Closing, IFSI will deliver to Mr. Morris

☐ (a) a certificate(s) representing 2,500,000 shares of IFSI's common stock, as provided in Section 2.02, registered in the name of Mr. Morris, or at his election jointly with his spouse, provided the election together with the name and social security number of his spouse or any other designee that Mr. Morris shall designate is delivered to IFSI not less than five business days prior to the Closing; and

☐ (b) Action by IFSI's board of directors electing Mr. Morris as a director of IFSI;

☐ (c) Officers' and Secretary's Certificates of IFSI in the form set forth in Exhibits "A" and "B", respectively; and

☐ (d) An Employment Agreement in the form set forth in Exhibit "F".

ADDED BY AMENDMENT:

☐ (e) A promissory note, as provided in Sections 2.02(ii) and 2.03.

☐ (f) One certificate representing 500,000 shares of IFSI's common stock registered in the name of Mr. Morris or as provided in Section 3.03(a), as amended.

SECOND AMENDMENT TO
AND
CONFIRMATION OF OUTSTANDING OBLIGATIONS

THIS SECOND AMENDMENT TO AND CONFIRMATION OF OUTSTANDING
OBLIGATIONS ("2ACOO"), made and entered into January 19, 2010, by and between
PlanGraphics, Inc., a Colorado corporation, successor in interest by merger to
Integrated Freight Corporation, a Florida corporation formerly named Integrated Freight
Systems, Inc., ("PGRA") and T. Mark Morris ("Mr. Morris") in connection with IFC's
purchase of Morris Transportation, Inc., an Arkansas corporation, ("MTI"), from Mr.
Morris pursuant to that certain Stock Exchange Agreement dated as of August 25, 2008
("Original Agreement"), as amended September 2, 2008 ("Amendment") and as
amended and confirmed October 31, 2009 by the Amendment To and Confirmation of
Outstanding Obligations ("ACOO").

1.  This 2ACOO supercedes and replaces the expression and statement of all
specific financial terms and related obligations of PGRA to Mr. Morris as set forth in the
Original Agreement, the Amendment and the ACOO. The consideration for this 2ACOO
is the payment by PGRA of the sum of $100,000 to Mr. Morris and mutual benefits to be
derived by both parties arising from the public market for PGRA's common stock and
reports under the Securities Exchange Act of 1934 reflecting the changes in PGRA's
outstanding obligations to Mr. Morris, as set forth herein.

2.  Both parties acknowledge that the amended and restated Promissory Note
and Security Agreement for an original principal amount of $600,000 dated September
17, 2008, as amended May 27, 2009, was not completed as a result of the PGRA's
failure to close the funding recited in the ACOO.

3.  Upon payment by PGRA to Mr. Morris of $100,000 principal amount of the
Promissory Note and Security Agreement ("Note"), the Note will be amended and
restated at the date hereof ("Amended Note"), under the title of " Amended and
Restated Promissory Note" to reduce the principal amount thereof to $500,000, which
shall be payable as to principal as follows: $25,000 within thirty days and $125,000
within ninety days, in each case from the date of this 2ACOO, and the balance of the
Amended Note due with accrued and unpaid interest on or before May 1, 2010. The
collateralization of the Amended Note with the common stock of MTI and any other
collateral is terminated, together with any related Security Agreement. Any default in
the timely payment of interest prior to the date hereof is waived. The parties
acknowledge that an amended Promissory Note and Security Agreement as
contemplated by the ACOO was not issued or delivered.

4.  The installment obligation of $150,000 due pursuant to the Amendment ninety
days after September 2, 2008 will be converted into and added to the promissory note
to be issued pursuant to the next item "5".

5.  PGRA's payment of $250,000 to Mr. Morris to be made thirteen months after
the "reset date", to be reduced by MTI's profit shortfall, and the installment obligation of
$150,000 identified in item "4", above, all as provided in the Amendment, will be
converted to a promissory note ("Note 2") in the aggregate principal amount of $400,000
due May 1, 2010, with an interest rate of eight percent per annum payable at maturity,
principal and accrued and unpaid interest convertible into PGRA common stock at any
time at the option of Mr. Morris at $1.00 per share and mandatorily convertible before
maturity at $1.00 per share in the event PGRA's common stock achieves a closing price

EXHIBIT
3

of $1.00 per share or more for each of five consecutive trading days; provided, that in the event the Note is optionally converted and twelve months after the conversion date the closing price of PGRA's common stock for five consecutive trading days preceding the last day of such twelve month period has not been $1.00 per share or more, then PGRA shall issue such additional number of shares determined by dividing the principal amount of and accrued interest on the promissory note on the conversion date by the average of such closing prices during such five day period. PGRA waives adjustment or reduction in the $250,000 amount identified above that would have arisen from profit shortfall as described in the Amendment.

6. Mr. Morris hereby waives the payment of $50,000 arising from IFC's failure to make the capital infusions referenced in "4", above, based on PGRA's waiver of the reduction in the payment of $250,000 (now included in Note 2) that would have arisen from profit shortfall as described in the amendment.

7. PGRA's obligation to provide the equity infusion to MTI of $100,000 or of $200,000 as contemplated by the Amendment is hereby terminated.

8. The date of PGRA's payment of a bonus to Mr. Morris in the amount of $25,000 is hereby rescheduled to May 1, 2010.

9. PGRA will issue 150,000 shares of common stock to Mr. Morris in payment for sums Mr. Morris has personally advanced to MTI; provided, that in the event, twelve months after the date of this 2ACOO, the closing price of IFC's common stock for five consecutive trading days preceding the last day of such twelve month period has not been $1.00 per share or more, then PGRA shall issue such additional number of shares determined by subtracting 150,000 from the quotient of $150,000 divided by the average of such closing prices during such five day period. Mr. Morris acknowledges that PGRA will be unable to issue the shares of its common stock pursuant to this paragraph 9 until the stockholders have approved a reverse stock split that is the subject matter of a preliminary Schedule 14C filed under the Exchange Act.

10. All non-financial provisions of the Original Agreement, the Amendment and the ACOO shall remain unchanged.

PlanGraphics, Inc.

By: _____          _____
Paul A. Henley, President                 T. Mark Morris

## AMENDED AND RESTATED PROMISSORY NOTE

$500,000.00

Original Issue Date: September 17, 2008
Amendment Date: May 27, 2009
Amendment and Restatement Date: January 19, 2010
Lutz, Florida

FOR VALUE RECEIVED, PlanGraphics, Inc., a Colorado corporation, as successor in interest by merger to Integrated Freight Corporation, a Florida corporation, ("Maker") whose principal executive office is located at 16827 Livingston Road, Lutz, Florida 33559-7615, promises to pay to T. Mark Morris ("Holder") the sum of Five Hundred Thousand Dollars and No Cents ($500,000.00), together with simple interest at a rate of eight percent per annum payable at the Maturity Date. Principal shall be paid, as follows:

$25,000   Not later than thirty days after the date hereof;
$125,000  Not later than ninety days after the date hereof; and
$350,000  Not later than May 1, 2010 ("Maturity Date");

subject nevertheless to and extension in accordance with Holder's forebearance agreement for the benefit of Tangiers Investors L.P., at such address as to which written notice is given to Maker by Holder from time to time.

This Amended and Restated Promissory Note amends and restates in its entirety and replaces a promissory note and security agreement dated September 17, 2008 ("Original Note"), as amended and replaced by an amended promissory note and security agreement dated May 27, 2009 ("Amended Note"). This Amended and Restated Promissory Note shall be effective upon the Maker's payment to the Holder of the sum of $100,000 in principal amount of the Amended Note, whereupon the Holder shall surrender for cancellation of the Original Note and the Amended Note. The provisions for security set forth in the Original Note and the Amended Note, and the Security Agreement executed in connection therewith, are hereby terminated, to which the Holder hereby consents, as evidenced by his signature to a copy of this Amended and Restated Note.

Maker hereby reserves the right to prepay this Note in whole or in part at any time and from time to time prior to the Maturity Date without premium or penalty.

The Maker's failure to pay to Holder when due principal of or interest on the Note shall be events of default.

Maker agrees to pay to Holder's reasonable attorneys' fees and costs, whether or not an action be brought, for the services of counsel and of a collection agency employed after the Maturity Date or upon default to collect this Note or any principal or interest due hereunder, or to protect the collateral security, if any, or enforce the performance of any other agreement contained in this Note or in any instrument of security as aforesaid, including costs and attorneys' fees on appeal, in bankruptcy matters or post judgment relief.

Page 1 of 2 pages.

Maker does hereby waive notice of acceptance of this Note, notice of the occurrence of any default under this Note or under any instrument securing this Note and presentment, demand, notice of maturity, protest, notice of dishonor, notice of non-payment and notice of protest and all requirements necessary to hold Maker liable as a maker of this Note.

The use of the proceeds of this Note is for commercial purposes and is not for personal or household purposes. This Note is an Arkansas contract and shall be construed and interpreted under Arkansas law.

Amendment acknowledged and accepted:    PlanGraphics, Inc.

_____          By: _____
T. Mark Morris                                Paul A. Henley, President

**PROMISSORY NOTE**

$400,000.00

January 19, 2010
Lutz, Florida

FOR VALUE RECEIVED, PlanGraphics, Inc., a Colorado corporation, as successor in interest by merger to Integrated Freight Corporation, a Florida corporation, ("Maker") whose principal executive office is located at 16827 Livingston Road, Lutz, Florida 33559-7615, promises to pay to T. Mark Morris ("Holder") the sum of Four Hundred Thousand Dollars and No Cents ($400,000.00), together with simple interest at a rate of eight percent per annum payable on May 1, 2010, subject to extension by agreement of the Holder, at such address as to which written notice is given to Maker by Holder from time to time.

This Promissory Note is delivered pursuant to that Second Amendment To and Confirmation of Outstanding Obligations dated January 19, 2010. This Note shall be effective upon the Maker's payment to the Holder of the sum of $100,000 against a Promissory Note and Security Agreement in the original principal amount of $600,000, as subsequently amended January 19, 2010 to reduce the principal amount thereof $500,000.

Maker hereby reserves the right to prepay this Note in whole or in part at any time and from time to time prior to the Maturity Date without premium or penalty.

The Maker's failure to pay to Holder when due principal of or interest on the Note shall be events of default.

Maker agrees to pay to Holder's reasonable attorneys' fees and costs, whether or not an action be brought, for the services of counsel and of a collection agency employed after the Maturity Date or upon default to collect this Note or any principal or interest due hereunder, or to protect the collateral security, if any, or enforce the performance of any other agreement contained in this Note or in any instrument of security as aforesaid, including costs and attorneys' fees on appeal, in bankruptcy matters or post judgment relief.

Maker does hereby waive notice of acceptance of this Note, notice of the occurrence of any default under this Note or under any instrument securing this Note and presentment, demand, notice of maturity, protest, notice of dishonor, notice of non-payment and notice of protest and all requirements necessary to hold Maker liable as a maker of this Note.

The use of the proceeds of this Note is for commercial purposes and is not for personal or household purposes. This Note is an Arkansas contract and shall be construed and interpreted under Arkansas law.

Amendment acknowledged and accepted:     PlanGraphics, Inc.

_____          By: _____
T. Mark Morris                                Paul A. Henley, President

Page 1 of 1 page.

### THIRD AMENDMENT TO
### AND
### CONFIRMATION OF OUTSTANDING OBLIGATIONS

THIS THIRD AMENDMENT TO AND CONFIRMATION OF OUTSTANDING OBLIGATIONS ("3ACOO"), made and entered into December 2, 2010, by and between Integrated Freight Corporation, a Florida corporation, ("IFC") formerly named PlanGraphics, Inc., a Colorado corporation, ("PGRA") which acquired an earlier Integrated Freight Corporation, a Florida corporation, ("Original IFC") which is the original obligor under the agreements and amendments identified below, and T. Mark Morris ("Mr. Morris") in connection with Original IFC's purchase of Morris Transportation, Inc., an Arkansas corporation, ("MTI"), from Mr. Morris pursuant to that certain Stock Exchange Agreement dated as of August 25, 2008 ("Original Agreement"), as amended September 2, 2008 ("Amendment") and as amended and confirmed October 31, 2009 by the Amendment To and Confirmation of Outstanding Obligations ("ACOO") and the Second Amendment To and Confirmation of Outstanding Obligations ("2ACOO").

1. This 3ACOO supersedes and replaces only those provisions of the 2ACOO which relate to one or more promissory notes (the "Note"), as amended, issued by IFC and its predecessors, Original IFC and PGRA.

2. IFC will pay Mr. Morris the sum of $194,000 by wire transfer on December 3, 2010 against the principal balance of the Note.

3. IFC will pay Mr. Morris the sum of $196,000 by wire transfer on or before March 31, 2011 against the principal balance of the Note ("Final Payment").

4. Mr. Morris hereby elects to convert into shares of common stock of IFC the principal balance of the Note in the amount of $970,000 at a conversion rate of $0.50 per share and accrued and unpaid interest and interest to accrue through the date of the Final Payment on the sum of the Final Payment at a conversion at a rate of $1.00 per share.

5. Except as set forth herein, all the terms of the 2ACOO which have not been performed remain unchanged

Integrated Freight Corporation

By: _____

Paul A. Henley, Chief Executive Officer          T. Mark Morris

**EXHIBIT
4**

# ENGAGEMENT AGREEMENT
# FOR CONSULTING SERVICES

This Engagement Agreement dated August 2, 2012, 2012 is between Integrated Freight Corporation ("IFCR" or "Company") 6371 Business Boulevard, Suite 200, Sarasota, FL 34240, and Fuselier Consulting LLC, or assigns, with its principal offices at One De Wolf Road, Old Tappan, NJ 07675 ("Consultant").

Company and Consultant agree as follows:

1.  **Scope of Services:**

    (a)    IFCR shall engage Consultant to assist with the strategic management of the Company (the "Services"), including support for its current operations and its future growth.

    (b)    Consultant shall, in connection with this Agreement, conduct its due diligence with respect to the financial condition of IFCR and shall, together with Company's management, prepare current and pro forma financial forecast and a detailed strategic growth plan. Consultant's information material shall include the development of an Executive Summary and a Strategic Growth Plan.

    (c)    Consultant shall, at the request of Company, be reasonably available for meetings, conference calls, acquisition reviews and due diligence, negotiations with lenders and prospective investors. Consultant shall be available to respond to inquiries and review marketing information, financing material or any other aspect of the Company's capitalization with prospective investors, parties or partners.

    (d)    Consultant shall perform on a periodic basis the following functions, but nothing herein shall be interpreted as an appointment of Consultant or its independent contractors or employees as directors of IFCR unless otherwise specifically agreed, nor shall Consultant have such involvement in the management of IFCR as to bring Consultant within the definition of "control person" under the federal securities laws, unless otherwise explicitly agreed to in writing:

        a.    **Review of the Organization and Structure of the Company** – a quarterly review and description of the corporate structure of the Company and its affiliates including any diagrams or charts including a list of the officers and directors of the Company and a brief description of their duties.

        b.    **Assets and Operations of the Company** - Prior to the end of each quarter period, Consultant will review the Company's financial position, and, together with the Company's auditors, assist in gathering information for the Company's financial statements with notes, and the latest interim financial statements since the end of the last fiscal year and product sales and cost of sales analysis as requested by the Company.

Page 1 of 8

EXHIBIT
5

c. **Intellectual Property** - Consultant will work with Company to prepare a list of all patents, trademarks, trade names, trade secrets, service marks and copyrights owned or used by the Company, all applications therefor and copies thereof, search reports related thereto and information about any liens or other restrictions and agreements on or related thereto (quarterly) as requested by the Company from time to time.

d. **Reports** - Consultant will assist Company with the preparation of descriptions or reports of the Company as requested by the Company, including any brochures used in soliciting business or advertising. Consultant will assist with the preparation of overviews of market reports, analyses, articles, studies, appendices or other reports that may be needed and requested by the Company from time to time.

e. **Environmental Matters** - Consultant will assist with compilation of information about environmental matters relating to audits and site assessments, complaints, lawsuits, or claims that are readily known to the Company as requested by the Company. Consultant will assist Company with the review and compilation of any written analyses conducted by the Company or an outside consultant relating to future environmental activities (i.e., upgrades to control equipment, improvements in waste disposal practices, materials substitution) for which expenditure of funds greater than $10,000 is either certain or reasonably anticipated within the next five years and an estimate of the costs associated with such activities as requested by the Company.

f. **Employment Practices** - Consultant will assist Company with review of and preparation of employment contracts, consulting agreements, severance agreements, independent contractor agreements, non-disclosure agreements and non-compete agreements relating to any employees of the Company as requested by the Company.

2. **Engagement Fee:** During the term of this Agreement, IFCR shall pay Consultant an Engagement Fee as set forth in Exhibit A which will be earned as described in such Exhibit. Such payments represent fees relating to assisting in the operation of the Company, gathering of due diligence, preparation of marketing information and financing materials, introduction to parties, preliminary transaction discussions and other related activities.

**Payment of Fees to Consultant.** The Company agrees that all fees due to Consultant will be paid as set forth in Exhibit A or within 15 days following receipt of Consultant's invoice for Services for the month, or other relevant time period, in which the Services were performed and

Initials_____

compensation earned.

3. **Expenses:   Company shall** reimburse Consultant for its approved out-of-pocket expenses ("Reimbursable Expenses") and Consultant will provide appropriate documentation of these expenses.

4. Intentionally left blank.

6. **Term:** The term of this Agreement shall commence on July 3, 2012 and shall remain in effect for a period of three years, with one (1) automatic 180 day extension, provided that neither party has provided written notice to the contrary 90 days prior to the expiration of the agreement. All rights and obligations hereunder shall be terminated upon the expiration of the initial term of this Agreement, provided that (a) termination of this Agreement shall not affect the provisions of paragraphs 2 and 3 in respect of payment of fees and (b) all parties hereto shall continue to be bound by the terms of the confidentiality and exclusivity provisions of this Agreement even after the expiration of the term of this Agreement.

7. **Confidentiality:** Each of the parties hereto (the "Recipient Party") will from time to time receive certain trade secrets and confidential information ("Confidential Information") from each other and unaffiliated third parties (including prospective investor(s)) and their respective representatives, employees and agents (the "Disclosing Party"). The Recipient Party agrees not to use (except in connection with the performance of its duties hereunder) or disclose at any time (except to the Recipient Party's employees and agents who require the same for the purposes hereof and who are bound to the Recipient Party by like obligations as to confidentiality and use restrictions as contained in this Agreement) Confidential Information provided to it by the Disclosing Party or its agents and advisors. Confidential Information shall include, without limitation, computer models and databases, lists of contacts and any other information identified in advance by the Disclosing Party as confidential. Confidential Information shall not include any information that (i) was in the public domain prior to disclosure, or (ii) is independently developed, or (iii) is received from a third party with no breach of a duty owed hereunder; or (iv) any information which is disclosed in the Company's periodic Securities and Exchange Commission reports.. The Recipient Party agrees not to disclose or to use in a competitive manner Confidential Information for a period of the greater of two years following the termination of this Agreement or the term of any confidentiality agreement governing such Confidential Information.

8. **Entire Agreement:** This represents the entire agreement between IFCR and Consultant with respect to the subject matter hereof, superseding all previous oral or written communications, representations, understandings or agreements relating to this subject. This Agreement may be modified only by a duly authorized party and executed in writing signed by the parties hereto.

9. **Notices:** Any notice provided under this Agreement shall be in writing and shall be deemed to have been effectively given (i) upon receipt when delivered personally, (ii) one (1) business day after sending when sent by a commercial express delivery service (such as Federal Express or USPS Express Mail) providing a delivery confirmation, or (iii) 5 business days after depositing with the post office a notice sent by certified mail, return receipt requested, to the

Initials_____

addresses noted in the preamble to this contract or any updated address provided by either party for notices.

10.  **Independent Contractor and Withholding:** At all times, the Consultant will be an independent contractor, and as such, will not have the authority to bind Company. Consultant will not act as an agent nor shall Consultant be deemed to be an employee of Company for the purposes of any employee benefits, or otherwise. Consultant recognizes that no amount will be withheld from its compensation for payment of any federal, state or local taxes and that Consultant therefore has sole responsibility to pay such taxes, if any, and file such returns as shall be required by applicable laws and taxes, if any. Consultant agrees to defend, indemnify and hold Company harmless from any and all claims made by any entity on account of an alleged failure by Consultant to satisfy any such tax or withholding obligations.  Consultant shall not enter into any agreements or incur any obligations on behalf of Company except as presented and approved by Company's Board.

11.  **Assignment:** This Agreement may be assigned by Consultant to an entity that is substantially owned or managed by Consultant or its principal. The shares issuable pertaining to the agreement may be assigned by Consultant at any time to any party subject to compliance with applicable Federal and State securities laws. Company may assign any rights and liabilities under this Agreement to an affiliate or to a successor to all or a substantial part of its business and assets but solely with the consent of Consultant. Subject to the foregoing, this Agreement will inure to the benefit of and be binding upon each of the heirs, assigns and successors of the respective parties.

12.  **Severability:** If any court or arbitrator shall determine that any provision of this Agreement is invalid, illegal or unenforceable, such provision shall be severed and the remaining provisions shall continue in full force and effect.

13.  **Governing Law:** This agreement shall be governed by and interpreted in accordance with the laws of the State of Florida applicable to agreements made and services to be performed within such jurisdiction

14.  **Arbitration:** Any dispute or disagreement which may arise among the parties hereto in connection with either the interpretation or the performance or nonperformance hereof, shall be settled by arbitration under the Commercial Arbitration Rules of the American Arbitration Association or such other arbitration services as may be agreed upon by the parties. The place of arbitration shall be Florida. The prevailing party shall be entitled to its reasonable attorneys fees.

15.  **Counterparts:** More than one counterpart of this Agreement may be executed by the parties hereto, and each fully executed counterpart shall be deemed an original.

16.  **Authority to Act.** The Company hereby represents and warrants that this Agreement has been approved by resolution of the Company's Board of Directors, and the President of the Company has been authorized to execute this Agreement on behalf of the Company.

Page 4 of 8

Initials_____

has been authorized to execute this Agreement on behalf of the Company.

17. **Indemnification.** Company will indemnify and hold Consultant and its employees, contractors, attorneys and agents harmless from any and all claims arising from its activities as financial consultant to Company, except in the event the actions or inactions of the Consultant are deemed to involve gross negligence   Such indemnification shall include, but not be limited to, Consultant's attorneys' fees.

18. **Counterparts Facsimile Execution.** For purposes of this Agreement, a document (or signature page thereto) signed and transmitted by facsimile machine is to be treated as an original document.  The signature of any party thereon, for purposes hereof, is to be considered as an original signature, and the document transmitted is to be considered to have the same binding effect as an original signature on an original document.  At the request of any party, a facsimile or telecopy document is to be re-executed in original form by the parties who executed the facsimile or telecopy document.  No party may raise the use of a facsimile machine as a defense to the enforcement of the Agreement or any amendment or other document executed in compliance with this Section.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of August 2nd 2012.

AGREED AND ACCEPTED,

Integrated Freight Corporation

Signature:

Name:       Henry P. Hoffman

Title:         President

AGREED AND ACCEPTED,

Fuselier Consulting LLC

Signature:

Name:       David N. Fuselier

Page 5 of 8

Initials

## EXHIBIT A
Between Company and Consultant
Dated August 2, 2012

### Issuance and delivery of shares:

### At signing          10,000,000 shares
The Consultant performed its required due diligence on the Company prior to execution of the contract and these shares will be issued and delivered to Consultant as of the effective date of this Agreement for its review and research on the Company as client. These shares were earned as of the date of the signing.

### At 9/1/2012          2,500,000 shares
During the period September 1, 2012 through November 30, 2012 the Consultant shall perform the following services for the Company:   intensive review of all contracts relating to the Company's operations including its filings with state and federal authorities, detailed review of the Company's organizational structure, capital structure and shareholder communications. Consultant shall provide a review of its findings to management and provided a summary of action items relating to these activities to the Company.

### At 12/1/2012          2,500,000 shares
During the period December 1, 2012 through February 28, 2013 the Consultant shall perform the following services for the Company:   in conjunction with broker dealers, equity sources, and management review, proxies, transfer agent agreements, registration agreements and other agreements regarding the ownership of Company. Review class and number of securities held and provide tactical and strategic consultancy on structures beneficial to the Company. Consultant will provide a review of its findings to management and provided a summary of action items relating to these activities to the Company. One-third of these shares shall be deemed fully earned and paid to Consultant at the end of each month subsequent to December 1, 2012.

### At  March 1, 2013   2,500,000 shares
During the period March 1, 2013 through May 30, 2013 the Consultant shall perform the following services for the Company:   in conjunction with management, conclude interim CFO search, present VP of Business Development selection and review candidates for corporate and securities counsel. Continue search for acquisition targets and strategic alliances and debt and equity sources.  Refine the strategic plan of the Company to mirror its product and service offerings. Begin information gathering for auditors and counsel relating to fiscal year end Board meeting and fiscal year audit. One-third of these shares shall be deemed fully earned and paid to Consultant at the end of each month subsequent to March 1, 2013.

Consultant shall provide a review of its findings to management and provide a summary of action items relating to these activities to the Company.

Initials_____

**End of each Quarter starting 6/1/2013  2,500,000 shares**
During the quarterly periods following June 1, 2013, the Consultant will be assigned specified assignments by the CEO of Company within fifteen days before the beginning of each quarterly period. Such assignments will be provided in writing, and the timing and execution of the assignments will be confirmed by Consultant prior to the beginning of each quarter. Consultant will provide a review of its assignments to management and a summary of actions items relating to these activities in a format satisfactory to Company. In the absence of specific assignments from the CEO, the Consultant will continue the assignments previously provided by the CEO. One-third of these shares shall be deemed fully earned and paid for by Consultant at the end of each month beginning June 1, 2013.

**Consultant will provide and pay the compensation for the following personnel during the term of the engagement:**

**Board Member** - responsible for participating, together with the Company's Chairman, in the tooling of the Company's strategic plan to ensure the Company's corporation policy is aligned with the Board's approved motions. To provide external insight into the Company's internal processes and to act as a sounding board for the Company's CEO. This Board Member will be required to attend a majority of Board meetings as requested.

**Vice President-Finance** – responsible for maintaining, administering and developing corporate strategy relating to the Company's shareholder base, creditors and capital formation. In addition, the Vice President-Finance will facilitate internal controls relating to the Company's merger and acquisition process and overall corporate profitability improvements.

**Personnel to be provided as negotiated.** The Company and the Consultant may agree to revise the services provided herein.

Page 7 of 8

Initials_____

**EXHIBIT B**
Relationship of Operating Companies to Company and Consultant
Dated August 2, 2012

<u>Full Decision-Making and Operational Control</u>. Until such time as the personal guarantees of Mark Morris and Monte Smith have been released, Company agrees that Morris and Smith shall retain full and complete control of their respective subsidiary operating decisions, including the normal course direction of funds and personnel. This does not in any way remove the obligation of Morris and Smith to fully cooperate in joint corporate decisions on such matters related to pooling of financial interests such as fuel, insurance, employee benefits, and other matters where economies of scale can be reasonably expected and demonstrated.

<u>Elimination of Personal Guarantees</u>. Company shall endeavor, on a best efforts basis, to remove the personal guarantees of Smith and Morris as soon as possible. Company also acknowledges that removal of the personal guarantees of Smith and Morris is critical and a key component of the inducement to enter into this Agreement.

<u>IFCR Obligations</u>. Company shall endeavor to, on a best efforts basis, pay or settle certain obligations that are currently secured by Morris and/or Morris Transportation. Moreover, Company shall not enter into any additional debt in the name of Morris Transportation or Smith Systems or secured by assets of Morris Transportation or Smith Systems until the personal guaranty of Morris and Smith is removed.
<u>Conversion of Debt</u>. The parties acknowledge that Mark Morris and Monte Smith have loaned to their separate entities $217,000.00 and $250,000.00, respectively. $17,000 of the Morris loan will be repaid in cash from operations. These debts shall be fully documented and Company, Morris and Smith agree that such loans are convertible into Preferred Shares of the Company, once such shares are authorized. The conversion price of the Preferred Shares shall be at $.005 per share and shall include a 4.99% conversion blocker such that the preferred shareholder shall at all times remain below 4.99% of the Company's outstanding stock.  Note:  Need to specifically define the terms of the Preferred Shares, state when authorization for the Preferred Shares will be submitted to the shareholders of Company for approval, guaranty that Fuselier, Hoffman and other critical shareholders will vote for issuance of the Preferred Shares.  Process of creating the preferred share class will commence within ten days of this agreement date.

<u>Additional Stock Distributions</u>. Company agrees that it will create an executive stock incentive plan and that Morris and Smith will be eligible to participate in such plan so long as they remain employed by the company. Note:  Smith and Morris are granted the right to participate in the executive stock incentive plan to be written by the Compensation Committee.

<u>Sale of Stock</u>. Company shall cooperate with Morris and Smith in the sale of personally owned shares to include prompt removal of legends, S-8 sales, and other provisions to permit liquidity consistent with SEC rules, regulations, and limitations on stock sales.

<u>Corporate Overhead Charges</u>. There shall be no corporate overhead charges assessed to Smith Systems Transportation or Morris Transportation until all personal guarantees of Smith and Morris have been eliminated, unless agreed by Smith and Morris.

<u>Board Resignations</u>. Smith and Morris agree to resign from their position as members of the IFCR Board of Directors effective August 1, 2012.

Page 8 of 8

Initials_____